**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Jamie Riley, et al.

    v.                                                    Civil No. 15-cv-152-SM

School Administrative
Unit #23, et al.

**REPORT AND RECOMMENDATION**

    Jamie and Alan Riley ("plaintiffs"), on behalf of their minor child A.R., brought suit in this court against School Administrative Unit No. 23 ("District") and Dr. Donald LaPlante (collectively, "defendants") alleging that the defendants violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504") by failing to provide reasonable accommodations related to A.R.'s use of a service animal.  Compl., Doc. No. 1.  Before the court for a report and recommendation is the plaintiffs' motion for a preliminary injunction.  Pls.' Mot. for Prelim. Inj., Doc. No. 2.  For the reasons that follow, the court recommends that the motion for a preliminary injunction be denied.

**Findings of Fact**

I.   **Undisputed Findings of Fact**

These facts are taken from the agreed upon facts submitted by the parties on November 6, 2015.  Doc. No. 18.

1.   A.R. is an eight-year-old second grade student attending Woodsville Elementary School who has been diagnosed with developmental delays, hypotonia (decreased muscle tone), hearing loss, dysphagia (difficulty swallowing requiring all nutrition through a feeding tube), epilepsy, and cortical blindness.

2.   A.R. is primarily non-verbal.

3.   A.R. suffers from frequent seizures of multiple types (drop, grand mal, temporal lobe).

4.   A.R. is a qualified individual with a disability per Title II of the Americans with Disabilities Act.

5.   A.R. enrolled full-time in [the District] in September of 2012.

6.   [The District] receives federal financial assistance.

7.   Since his enrollment, A.R. has been receiving special education and related services.  Since June of 2012, these services have included being accompanied at all times by a 1:1 aide who, currently, is a registered nurse.

8.    In addition to nursing services, A.R. receives instruction from a special education teacher, a teacher of the deaf, a teacher of the visually impaired, and related services of speech, physical therapy, and occupational therapy.

9.    When A.R. was a preschool student and only attended school for a few hours a day, [p]laintiffs first requested that he be accompanied at school by a service dog named Carina.

10.   Carina is a service animal per the ADA and [New Hampshire Revised Statutes Annotated ("RSA") § 167].

11.   A.R.'s family provided a signed letter from A.R.'s doctor supporting his use of a service dog.

12.   Carina was trained by 4 Paws for Ability ("4 Paws") in Dayton, Ohio, an organization that has placed more than 1,000 service dogs.

13.   A.R. and his family spent eleven days at 4 Paws doing intensive training with Carina before she was brought home.

14.   Carina is a certified, multipurpose service animal.

15.   4 Paws trained Carina to alert for seizures by licking A.R.'s face.

16.   The [p]laintiffs requested that A.R.'s 1:1 aide (who at that time was not a nurse) act as Carina's handler.[1]

---

[1] Throughout this section, the parties use particular terms such as "handler," "accompany," and "supervise."  As discussed infra,

17.  The [p]laintiffs offered to provide training on the proper way to command and control Carina.

18.  The District agreed to the 1:1 aide arrangement on a trial basis during the summer of 2011.

19.  The District withdrew its agreement to have A.R.'s 1:1 aide assist A.R. in acting as Carina's handler.

20.  The District notified the [p]laintiffs that they could have Carina accompany A.R. in school but they would be required to hire an adult, at their own expense, to accompany Carina.

21.  The [p]laintiffs hired Denise Young, at additional cost, to attend school with A.R. to accompany Carina.

22.  On July 13, 2012, the [p]laintiffs filed a complaint with the U.S. Department of Education's Office for Civil Rights ("OCR").

23.  The complaint was resolved through a Voluntary Resolution Agreement between OCR and the District dated May 22, 2013 (the "Voluntary Resolution").

24.  Pursuant to the terms of the Voluntary Resolution, the District adopted a service animal policy, which OCR expressly approved.

---

these words are legal terms of art relevant to the disposition of this case.  For the purposes of this section, the court does not weigh these terms as used by the parties in their stipulated facts as relevant towards its ultimate legal conclusion.

4

25.  In addition, as set forth in the Voluntary Resolution, the District agreed to contract with an expert in training seizure-alert dogs named Mike Robertson of the White Mountain College for Pets, or another trainer, to provide training to Carina and District staff.

26.  Mr. Robertson was specifically identified in the Voluntary Resolution as a possible qualified trainer approved by OCR.

27.  Mr. Robertson began training efforts with Carina and District personnel.

28.  As recently as September [2015], on a call with counsel for both parties[,] 4 Paws explained a trainer could come to New Hampshire at a cost of only a thousand dollars plus travel expenses.

29.  In January of 2014, the [p]laintiffs sent Carina back to 4 Paws for additional refresher training.

30.  When she returned, the [p]laintiffs began sending Carina to school tethered to A.R., accompanied by Denise Young who would hold Carina's leash at the same time.

31.  In March 2015, A.R. left school to undergo brain surgery to attempt to help reduce the frequency and severity of his seizures.

32.   While A.R. was recovering from his surgery, Denise Young began treatment for cancer and she was no longer able to supervise Carina at school.

33.   The District notified A.R.'s parents that he would not be able to return to school with Carina unless A.R.'s parents provided and paid for someone to supervise Carina.

34.   A.R.'s family has limited means and it was difficult for them to find an affordable adult to assist A.R. with Carina. A.R. returned to school on May 18, 2015 accompanied by Carina and an adult.

35.   A.R. continued to attend school throughout the summer accompanied by Carina and an adult paid for by [the] [p]laintiffs.

36.   When A.R. has attended school since the fall of 2015[,] he is accompanied by Carina and an adult paid by [the] [p]laintiffs.

37.   When an adult is available to assist A.R. with Carina and that adult is called out of the classroom for a phone call, a break, to use the restroom or any other reason, Carina must go with the adult leaving A.R. without Carina.

## II.  **Additional Findings of Fact**[2]

Having heard and reviewed the testimony and evidence presented by the parties and the parties' briefs, the court hereby makes the following additional findings of fact.

A.   A.R.'s Physical Health

38.  A.R.'s seizures impact his independent mobility. Defs.' Ex. 5 at 3-4.[3]

39.  A.R.'s most recent individualized education plan ("IEP") notes that he "relies on others to assist with his mobility for purposeful ambulation or to help him with transportation between settings when it is not safe to walk." Defs.' Ex. 6 at 3.

40.  At school, A.R. "needs significant support to be safe, to be mobile within his classroom and campus, to care for his personal needs, and to communicate those needs."  Id.

41.  Depending on A.R.'s fatigue during the day, he uses a variety of mobility devices, including a gait belt.  Id.; Defs.' Ex. 5 at 4.

---

[2] Any disputed findings of fact that are consistent with this section are granted.  Accordingly, all other disputed findings of facts are denied.
[3]  All exhibits referenced herein were admitted into evidence at the November 12, 2015 hearing.

42.   A.R. "needs and uses his helmet at [] all times due to [his] seizure disorder unless he is safely seated."  Defs.' Ex. 6 at 3.

43.   During the school day, the school nurse has a variety of responsibilities including wiping A.R.'s mouth to prevent skin irritation, feeding A.R., treating A.R.'s many seizures (by monitoring his breathing, placing A.R. in a safe location during seizures, and checking for any ill effects as a result of the seizure), assisting A.R. with walking from place to place, and, on some days, providing instructional support in place of a specialist.  Hr'g Tr. Excerpt 11:3-14:10, 18:3-15, 19:3-16, Doc. No. 38.

B.   The District's Service Animal Policy

44.   Under the District's service animal policy, the District instituted the following rules:

A. General Conditions

. . .

4. The district will not be responsible for the training, feeding, grooming or care of any service animal permitted to attend school . . . . It shall be the responsibility of the individual with a disability or designated handler to ensure the proper care and supervision of the service animal.

5. All service animals must be kept on a harness, leash or tether . . . or must otherwise be under the control of the individual with a disability or designated handler at all times.

. . .

B. Administrative Review of Service Animals

. . .

> 2.a. The school shall not provide staff support to care for or control a service animal, but may provide support to a student using a service animal as needed in a particular instance (i.e., accompanying a young student who takes a service animal outside to relieve him/herself).

> 2.b. Any handler (trainer, parent or other person) accompanying the service animal must have approval to work in the school from the New Hampshire Department of Education and undergo the State criminal background check.

Defs.' Ex. 10.

45.   Pursuant to the District's agreement with the OCR, during the summer of 2013, Mike Robertson of the White Mountain College for Pets began training Carina with District personnel in the attempt to control it with voice commands alone.   Agreed Facts ¶ 27, Doc. No. 18; Joint Timeline at 3, Doc. No. 19.   Soon after, however, the Rileys asked the District to suspend Robertson's training, citing 4 Paws disapproval of anyone other than 4 Paws training Carina.   Pls.' Ex. 14 at 2; Defs.' Ex. 3.

C.   Additional Facts

46.   For the purposes of the plaintiffs' preliminary injunction, the parties stipulate that A.R. is not in a position

to have Carina tethered to him during the school day.  Hr'g Tr. Excerpt 8:3-10 Doc. No. 38.

47.  Pursuant to the Rileys' agreement with 4 Paws, Carina is certified only when she is with an adult handler.  Defs.' Ex. 1 at 14.

48.  A.R.'s most recent IEP states that the Rileys "have provided [A.R.] with a seizure alert dog . . . [and] Carina and her handler must be with A.R. at all times."  Defs.' Ex. 6 at 3.

49.  Carina is trained to go through the school day without needing to be walked, eat, or relieve herself.  Hr'g Tr. Excerpt 9:4-10:8, Doc. No. 38.

50.  Presently, the individuals supervising Carina during the school day are responsible for walking her into school, giving her various verbal commands, holding her leash whenever she is moving with A.R. throughout the day, and providing her with a treat or positive reinforcement whenever she prealerts for a seizure.  Id. 2:3-4:22, 6:4-24.

51.  During most of the school day, the nurse is physically interacting with A.R.  Id. 14:11-15:2.

52.  At certain times during the school day - for example, at lunch, and during some instructional classes – the nurse is the only school employee with A.R.  Id. 19:6-15.

53.   In October 2013, Kathy Spencer, a former school nurse for A.R., attempted to handle Carina while concurrently performing her nursing duties.  After only two weeks, a designated handler returned to the school to handle Carina because Ms. Spencer stated that she was unable to safely perform both duties.  Id. 15:15-17:7.

54.   Jessica Piccone-Robie, a special education teacher who works with A.R., testified that she would be unable to handle Carina because she works with multiple students, and, when working with A.R., she must devote "110%" of her attention to him.  Id. 20:4-21:3.

## Legal Standard

"A preliminary injunction is an 'extraordinary and drastic remedy;' it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 689-90 (2008) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2948, at 129 (2d ed. 1995) (further citations omitted)).  Rather, "[a] plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  Voice of the Arab World,

Inc. v. MDTV Med. News Now, Inc., 645 F.3d 26, 32 (1st Cir. 2011) (quoting Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008)).[4]

"Though each factor is important . . . 'the sine qua non of [the] four-part inquiry is likelihood of success on the merits: if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity.'" Sindicato Puertorriqueño de Trabajadores, SEIU Local 1996 v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002) (alteration omitted)). "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success – rather, they must establish a strong likelihood that they will ultimately prevail." Sindicato Puertorriqueño, 699 F.3d at 10 (internal quotation marks and citations omitted).

---

[4] In this case, instead of a "traditional[] prohibitory preliminary injunction," the plaintiffs seek "a mandatory preliminary injunction, which requires affirmative action by the non-moving party in advance of trial . . . ." Braintree Labs., Inc. v. Citigroup Glob. Markets Inc., 622 F.3d 36, 40-41 (1st Cir. 2010). "Nevertheless, those exigencies should still be measured according to the same four-factor test, as '[t]he focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.'" Id. (quoting Crowley v. Local No. 82, 679 F.2d 978, 996 (1st Cir.1982), rev'd on other grounds, 467 U.S. 526 (1984)).

The court will assess each of these four elements in turn, mindful that the burden of satisfying them rests and remains with the party seeking the injunction.  <u>Esso Standard Oil Co. (P.R.) v. Monroig-Zayas</u>, 445 F.3d 13, 18 (1st Cir. 2006).

## Conclusions of Law

The plaintiffs contend that each of the four factors weighs in their favor.  The defendants disagree.  Based on the evidence presented and having reviewed the parties' briefs, the court concludes that while the balance of equities and consideration of the public interest do not clearly weigh for or against the plaintiffs, the plaintiffs have nonetheless failed to show a strong likelihood that they will ultimately prevail or suffer irreparable harm as defined under the law.

## I.   Likelihood of Success on the Merits

The plaintiffs assert claims under Title II of the ADA and Section 504 of the Rehabilitation Act.  Under the first factor, the defendants make two arguments: (1) the plaintiffs have failed to demonstrate a likelihood of success on their Title II and Section 504 claims; and (2) even though the plaintiffs bring a claim under the ADA and Rehabilitation Act, they were required, but failed, to exhaust administrative remedies under the Individuals with Disabilities Education Act, 20 U.S.C. §

1400 et seq. ("IDEA").  The court will address the latter
argument first.

    A.   <u>Exhaustion of Administrative Remedies</u>

    "Congress designed the IDEA as part of an effort to help
states provide educational services to disabled children.  Each
state receiving federal funding through its provisions must
ensure that every disabled school-age child receives a [free and
appropriate public education]."  <u>C.G. ex rel. A.S. v. Five Town
Cmty. Sch. Dist.</u>, 513 F.3d 279, 284 (1st Cir. 2008).  Under the
IDEA, prospective "plaintiffs would be 'required to utilize the
elaborate administrative scheme established by the [IDEA] before
resorting to the courts to challenge the actions of the local
school authorities.'"  <u>Frazier v. Fairhaven Sch. Comm.</u>, 276 F.3d
52, 60 (1st Cir. 2002) (quoting <u>N.B. by D.G. v. Alachua Cty.
Sch. Bd.</u>, 84 F.3d 1376, 1378 (11th Cir. 1996)).[5]

    Unlike the IDEA, neither Title II of the ADA nor Section
504 of the Rehabilitation Act include an exhaustion requirement.
<u>See</u> <u>Rivera Concepcion v. Puerto Rico</u>, 682 F. Supp. 2d 164, 170
(D.P.R. 2010) ("Courts that have examined whether plaintiffs
must exhaust their administrative remedies pursuant to Title II
of the ADA have consistently held that administrative exhaustion

---

[5] The exhaustion scheme established by the IDEA is laid out in 20
U.S.C. § 1415.

is not a requirement for a Title II claim."); <u>Weber v. Cranston Pub. Sch. Comm.</u>, 245 F. Supp. 2d 401, 406 (D.R.I. 2003) ("[T]he Rehabilitation Act does not affirmatively require exhaustion of administrative remedies, having adopted the procedural requirements of Title VI of the Civil Rights Act, which generally does not call for exhaustion.").

However, Title II or Section 504 claims "that [are] also available" under the IDEA, must "be exhausted to the same extent as would be required" under the IDEA.  20 U.S.C. § 1415(l); <u>see also</u> <u>D.B. ex rel. Elizabeth B. v. Esposito</u>, 675 F.3d 26, 39 n.5 (1st Cir. 2012).  Accordingly, "the IDEA's exhaustion requirement applies to claims under the ADA and Rehabilitation Act when those claims relate to a school's failure to provide a free appropriate public education."  <u>AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11</u>, 538 F. Supp. 2d 1125, 1152 (D. Minn. 2008) (collecting cases).

The defendants argue that the plaintiffs cannot proceed on their claims because they failed to first exhaust their administrative remedies under the IDEA.  For this argument, the defendants primarily rely on the Sixth Circuit's recent opinion in <u>Fry v. Napoleon Cmty. Sch.</u>, 788 F.3d 622 (6th Cir. 2015) <u>petition for cert. filed</u> No. 15-497 (Oct. 15, 2015).

In Fry, a Michigan elementary school refused to allow a student suffering from cerebral palsy to bring her service dog to school.  788 F.3d at 623.  The student's parents sued the school under Title II of the ADA and Section 504 of the Rehabilitation Act.  Id.  The district court granted the school's motion to dismiss "on the grounds that because the Frys' claims necessarily implicated [the student's IEP], the IDEA's exhaustion provision required the Frys to exhaust IDEA administrative procedures prior to bringing suit under the ADA and Rehabilitation Act."  Id.

On appeal, the Sixth Circuit affirmed the district court, holding that the IDEA's "exhaustion requirement applies to the Frys' suit because the suit turns on the same questions that would have determined the outcome of IDEA procedures, had they been used to resolve the dispute."  Id. at 627.  The Sixth Circuit reasoned that "[t]he primary harms of not permitting [the service dog] to attend school with [the student]—inhibiting the development of [the student's] bond with the dog and, perhaps, hurting her confidence and social experience at school—fall under the scope of factors considered under IDEA procedures."  Id. at 628.  The court concluded that the goal of the student to develop a bond with the service dog was "an educational goal" that falls "squarely under the IDEA's purpose"

16

of providing children with disabilities a free and appropriate public education.  Id.

Other cases cited by the defendants, Rivera-Quiñones v. Dep't of Educ., No. CIV. 15-1184 FAB, 2015 WL 5156013, at *1 (D.P.R. Sept. 1, 2015), and A.S. ex rel. Leonel S. v. Catawba Cty. Bd. of Educ., No. 5:11CV27-RLV, 2011 WL 3438881, at *1 (W.D.N.C. Aug. 5, 2011), similarly found "that when a claim relates to the provision of a student's education and alleges injuries that can be remedied through the IDEA's administrative procedures, the plaintiff must first exhaust the IDEA's administrative procedures, regardless of the statute under which the plaintiff sues or the specific relief she seeks." Rivera-Quiñones, 2015 WL 5156013, at *5; A.S. ex rel., 2011 WL 3438881, at *3-4 (finding that the plaintiff's complaint, when "viewed as a whole, [w]as an IDEA matter merely disguised as a discrimination claim and, therefore, subject to IDEA's exhaustion provision").

Here, even assuming the plaintiffs failed to exhaust potential administrative remedies, the IDEA's exhaustion requirement does not apply.  The plaintiffs do not contend that A.R.'s IEP is inadequate or that he is receiving a substandard education at Woodsville Elementary School.  During the hearing on the plaintiffs' motion, A.R.'s mother testified that she was,

17

in fact, satisfied with the education A.R. was receiving.  Hr'g
Tr. Excerpt 10:12-15, Doc. No. 38.  Further, the evidence in
this case demonstrates that Carina is not educationally
necessary, but, instead, is a health and safety service used by
A.R. to identify and alert for seizures.  The defendants, by
their own contentions, agree.  During the hearing on the
preliminary injunction motion, the defendants' counsel
acknowledged that if Carina does not come to school A.R is not
denied any program activity or service offered by the District.
The parties also agree that Carina is a service dog trained to
alert for seizures by licking A.R.'s face.  Agreed Facts ¶ 12,
Doc. No. 18.

        In addition, other courts with similar facts and
contentions to this case have found that the IDEA exhaustion
requirement is not implicated by the plaintiffs' Title II and
Section 504 claims.  See Alboniga v. Sch. Bd. of Broward Cty.
Fla., 87 F. Supp. 3d 1319, 1329 (S.D. Fla. 2015) (finding the
IDEA exhaustion requirement did not apply to a Title II and
Section 504 claim when the plaintiff did not allege that the
student has been denied a free and appropriate public education,
the IEP is deficient, or the service animal is educationally
necessary, and the district did not believe that the service
animal was necessary for the student's education); Sullivan By &

18

Through Sullivan v. Vallejo City Unified Sch. Dist., 731 F. Supp. 947, 951 (E.D. Cal. 1990) (finding the IDEA exhaustion requirement did not apply to a Title II and Section 504 claim when the plaintiff did not dispute that the IEP was inadequate or the service dog was educationally necessary).

Moreover, the Sixth Circuit's finding in Fry, requiring exhaustion from the IDEA in a Title II and Section 504 claim, is distinguishable from the facts of this case.  In Fry, the child's service dog was in school, not to assist with physical tasks (as it would have outside of school), but to primarily maintain its "bond" with the student so the service dog would be "a more effective service animal outside of school."  788 F.3d at 628 (internal quotation marks omitted).  The Sixth Circuit found that the student developing a bond with her service animal was "an educational goal, just as learning to read braille or learning to operate an automated wheelchair would be."  Id.

In this case, however, A.R's service animal is not at school to further an educational goal, but to simply identify and alert for seizures.  Carina is not tasked with assisting A.R. with any educational goals stated in his IEP.  Any psychological or emotional "bond" Carina may have with A.R. is secondary to its primary health and safety service.  Accordingly, Carina provides medically based services, which are

distinguishable from the educational goals that fall squarely
under the IDEA's purpose of providing children with disabilities
a free and appropriate public education.  See <u>AP ex rel.</u>
<u>Peterson</u>, 538 F. Supp. 2d at 1147-52 (finding no requirement of
exhaustion where claims for failure to accommodate a diabetic
student's need for administration of glucagon and testing of
blood sugar were not IDEA-type claims and were "more like asking
[the school] to accommodate a wheelchair-bound student by
installing a ramp or widening doors than it is like asking for
specific educational services"); <u>B.M. v. Bd. of Educ. of Scott</u>
<u>Cnty., Ky.,</u> 2008 WL 4073855, at *6 (E.D. Ky. Aug. 29, 2008)
(finding administrative exhaustion was not required where
allegations, which arose from "concerns about how blood sugar
monitoring would be conducted and insulin administered" at
school, were "not related to the way that Defendants provided an
education" and were "independent" of the IDEA).

Therefore, because of the parties' joint contentions about
the purpose and noneducational impact of Carina at school, the
plaintiffs' claims are not subject to the exhaustion
requirements found under the IDEA.

B.   Title II of the ADA and Section 504 of the
     Rehabilitation Act

Title II of the ADA states that "no qualified individual
with a disability shall, by reason of such disability, be
excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity, or be
subjected to discrimination by any such entity."  42 U.S.C. §
12132.  Title II applies to all state and local government
entities, including school districts.  Skinner v. Salem Sch.
Dist., 718 F. Supp. 2d 186, 193 (D.N.H. 2010).  Section 504 of
the Rehabilitation Act similarly states that no person "by
reason of her or his disability, be excluded from the
participation in, be denied the benefits of, or be subjected to
discrimination under any program or activity receiving Federal
financial assistance . . . ."  29 U.S.C. § 794.  Here, the
parties agree that the District receives federal financial
assistance.  Agreed Facts ¶ 6, Doc. No. 18.

For the court's analysis, "[t]he requirements under Title
II to make 'reasonable modifications of policies, practices, and
procedures,' and the requirement under Section 504 to make
'reasonable accommodations,' are, except with respect to
causation, materially identical."  Alboniga, 87 F. Supp. 3d at
1332 (citing Bledsoe v. Palm Beach Cnty. Soil & Water

Conservation Dist., 133 F.3d 816, 821 (11th Cir. 1998)).  With

this view, "[c]ourts have interchangeably relied on decisional

law applying Title II and Section 504[]" and view "ADA and

Rehabilitation Act counts as presenting a single claim."

Toledo-Colon v. Puerto Rico, 812 F. Supp. 2d 110, 117 (D.P.R.

2011).

Thus, to succeed on the merits of their claim, the

plaintiffs must satisfy the following elements:

> (1) that [A.R.] is a qualified individual with a
> disability; (2) that [A.R.] was either excluded from
> participation in or denied the benefits of some public
> entity's services, programs, or activities or was
> otherwise discriminated against; and (3) that such
> exclusion, denial of benefits, or discrimination was
> by reason of [A.R.'s] disability.

Parker v. Universidad de P.R., 225 F.3d 1, 5 (1st Cir. 2000)

(interpreting 42 U.S.C. § 12131).  In this case, the parties

agree that A.R. is a qualified individual with a disability.

Agreed Facts ¶ 4.  The defendants also do not appear to dispute

that if the District did discriminate against A.R., it was by

reason of his disability.[6]  Thus, the primary contention in this

case stems from the second element.

---

[6] Even if the defendants do contend that the plaintiffs fail to
satisfy the third prong, "a plaintiff who satisfies the first
two prongs meets the last prong merely by showing that a
reasonable accommodation was not provided."  Pardo v.
Napolitano, No. 07-20438, 2009 WL 3448181, at *2 (S.D. Fla. Oct.
26, 2009)

To determine whether the plaintiffs satisfy the second
element of a successful ADA claim, the court "must rely for
specifics on the regulations promulgated under Title II."  See
Parker, 225 F.3d at 5 (finding that a court must look to the
regulations because "[t]he language of Title II does not
elaborate on the obligation of a public entity to an individual
with a disability in the provision of 'services, programs, or
activities'").

Pursuant to the ADA, federal regulations generally provide
that "[a] public entity shall make reasonable modifications in
policies, practices, or procedures when the modifications are
necessary to avoid discrimination on the basis of disability,
unless the public entity can demonstrate that making the
modifications would fundamentally alter the nature of the
service, program, or activity."  28 C.F.R. § 35.130(b)(7).  As
to service animals, regulations provide that "a public entity
shall modify its policies, practices, or procedures to permit
the use of a service animal by an individual with a disability."
28 C.F.R. § 35.136(a).

In viewing the elements to satisfy an ADA claim and
applicable regulations, the plaintiffs may establish that A.R.
was discriminated against if they can show that the District
failed to make reasonable modifications to its policies,

23

practices, or procedures.  See Parker, 225 F.3d at 5; 28 C.F.R.
§ 35.130(b)(7).  If the District failed to make reasonable
modifications, to avoid judgment, it must show that making the
modifications would fundamentally alter the nature of its
services, programs, or activities.  See 28 C.F.R. §
35.130(b)(7).

     To determine whether the plaintiffs are likely to succeed
on the merits of their claim, the court must first determine
what modifications the plaintiffs are requesting.  Then the
court can compare the requested modifications to the
restrictions found in the applicable regulations.  Since the
filing of this case in April 2015, the modifications requested
by the plaintiffs have evolved.  Based on a reasonable reading
of the parties' briefs and the testimony presented at the
hearing, it appears that, for the purposes of a preliminary
injunction, the plaintiffs request that the District: (1) during
the school day, pay for a District employee to issue verbal
commands at Carina, hold Carina's leash when she accompanies
A.R., and use Carina in accordance with A.R.'s seizure protocol,
and (2) pay for a 4 Paws trainer to travel to New Hampshire and
conduct five days of training with Carina and District
personnel.

With regard to these requests, since 2013, the District has
followed a service animal policy that "govern[s] the use of
service animals by persons in the schools."  Defs.' Ex. 10 at 1.
As stated in the findings of fact, under the District's service
animal policy, "all service animals . . . must otherwise be
under the control of the individual with a disability or
designated handler at all times."  Defs.' Ex. 10 at 1 (emphasis
added).  In addition, the policy states that "[t]he school shall
not provide staff support to care for or control a service
animal, but may provide support to a student using a service
animal as needed in a particular instance (i.e., accompanying a
young student who takes a service animal outside to relieve
him/herself)" and "[a]ny handler (trainer, parent or other
person) accompanying the service animal must have approval to
work in the school from the New Hampshire Department of
Education and undergo the State criminal background check."  Id.
at 2 (emphasis added).

A reasonable reading of the District's policy concludes
that the District will only support a student's use of a service
animal in specific, "particular instance[s]."  Id.  Further, the
evidence shows that the District expects designated handlers of
service animals to be non-District employees.  In a January 2014
letter written to the Rileys, the District cited its service

25

animal policy in finding that it "is not responsible for the
care, supervision, or handling of service animals . . . [and] no
District employee will assume the responsibility of holding
Carina's leash . . . ."  Pls.' Ex. 14.

Therefore, the relevant inquiry here is whether the Rileys'
requested modification of the District's service animal policy
is reasonable under the ADA and its applicable regulations.

### 1.   28 C.F.R. § 35.136 – Service Animals

Generally, a public entity "shall modify its policies,
practices, or procedures to permit the use of a service animal
by an individual with a disability."  28 C.F.R. § 35.136(a).
Subsequent subsections address exceptions or limitations to this
general rule.  Both parties agree that § 35.136(d), and (e) are
relevant to this disposition of this case.  Further, the
plaintiffs contend that § 35.136(h), concerning "surcharges,"
also applies.  The Court will address each subsection in turn.

### (a)   § 35.136(d) – Animal under handler's control

28 C.F.R. § 35.136(d) states, in full:

A service animal shall be under the control of its
handler.  A service animal shall have a harness,
leash, or other tether, unless either the handler is
unable because of a disability to use a harness,
leash, or other tether, or the use of a harness,
leash, or other tether would interfere with the
service animal's safe, effective performance of work
or tasks, in which case the service animal must be

26

<u>otherwise under the handler's control</u> (e.g., voice control, signals, or other effective means).

<u>Id.</u> (emphasis added).

The plaintiffs contend that, despite A.R.'s physical limitations, he nonetheless qualifies as a "handler," similar to the students in <u>Alboniga</u>, 87 F. Supp. 3d at 1342, and <u>C.C. v. Cypress Sch. Dist.</u>, 2011 U.S. Dist. LEXIS 88287 (C.D. Cal. June 13, 2011).  The defendants maintain that A.R. is unable to act as Carina's handler.

As recognized in <u>Alboniga</u>, "there is very little in the way of case-law guidance as to what constitutes a 'hander' with 'control' over a service animal for purposes of these regulations."  87 F. Supp. 3d at 1342.  Yet, "if the language of a statute or regulation has a plain and ordinary meaning, courts need look no further and should apply the regulation as it is written."  <u>Textron Inc. v. C.I.R.</u>, 336 F.3d 26, 31 (1st Cir. 2003).  A plain reading of § 35.136(d) concludes that, for example, "tethering a service animal to the wheelchair of a disabled person constitutes 'control' over the animal by the disabled person, acting as the animal's 'handler.'  And, even absent tethering, voice controls or signals between the animal and the disabled 'handler' can constitute 'control.'"  <u>Alboniga</u>, 87 F. Supp. 3d at 1342.

Based on the plain reading of § 35.136(d), the evidence in this case demonstrates that A.R. is incapable of being a handler for Carina.  Importantly, the parties stipulate that A.R. is not able to have Carina tethered to him during the school day.  A.R. also cannot provide voice commands because he is primarily nonverbal.  Agreed Facts ¶ 2, Doc. No. 18.  Further, because A.R. usually walks with assistance and requires hand-under-hand guidance during educational activities, it is clear that he would be unable to safely hold or grab Carina's leash.  Defs.' Ex. 6 at 2.

In the cases cited by the plaintiffs, <u>Alboniga</u> and <u>C.C.</u>, the courts found that the students were the handlers because the service animals were tethered to the students throughout the school day.  <u>Alboniga</u>, 87 F. Supp. 3d at 1342; <u>C.C.</u>, 2011 U.S. Dist. LEXIS 88287, at *12.  Here, because A.R. cannot be tethered to Carina, use voice commands, or hold Carina's leash at any time throughout the day, he cannot be a handler.[7] Consequently, another individual is necessary to "control" Carina, as defined under § 35.136(d).

---

[7] In addition, the court notes that pursuant to the Rileys' agreement with 4 Paws, Carina is certified only when it is with an adult handler.  Defs.' Ex. 1 at 14.

(b)   § 35.136(e) — Care or supervision

Because of A.R.'s physical limitations, he is unable to handle Carina.  And, pursuant to 28 C.F.R. § 35.136(e), "[a] public entity is not responsible for the care or supervision of a service animal." § 35.136(e).  The parties dispute what constitutes "care or supervision."  The plaintiffs argue that "'care and supervision' entails something more than simply holding a service dog's leash and issuing a handful of commands, and therefore [§ 35.136(e)] does not preempt the [plaintiffs'] request for a preliminary injunction."  Pls.' Prop. Find. of Fact and Concl. of Law 12, Doc. No. 22.  The defendants argue that "supervision . . . is precisely what a handler does when Carina and A.R. are at school . . . ."  Defs.' Post-Hearing Brief 8-9, Doc. No. 35.

In Alboniga, the court found that "'care or supervision' equates to general upkeep and routine animal maintenance — such as feeding, curbing, training or healthcare."  87 F. Supp. 3d at 1343 (citing 28 C.F.R. § Pt. 35, App. A (clarifying that in such cases when a person with a disability cannot care or supervise a service animal for a period of time, another individual temporarily "walk[ing] or feed[ing] the service animal" would satisfy the § 35.136(e) requirement)).

Under this interpretation of § 35.136(e), a person tasked with handling Carina would not necessarily be "car[ing] or supervis[ing]" Carina.  § 35.136(e).  Testimony revealed that Carina is trained to go through the school day without needing to be walked, eat, or relieve herself.  Hr'g Tr. Excerpt 9:4-10:8, Doc. No. 38.  Additional testimony also concluded that the plaintiffs do not expect the District to handle Carina's veterinary care in any way.  Id.  Thus, under the view espoused in Alboniga, because the plaintiffs' requested modifications do not include the District maintaining the "general upkeep and routine animal maintenance" or Carina, the plaintiffs' request is appropriate under § 35.136(e).  87 F. Supp. 3d at 1343.

The defendants, however, persuasively note that the Alboniga analysis appears to concentrate more heavily on the "care" prong rather than the co-equal "supervision" restriction. Defs.' Post Hearing Brief 9, Doc. No. 35.  The defendants cite that "[t]he plain meaning of supervision" is "a critical watching and directing (as or activities or a course of action) . . . .'"  Id. (quoting Merriam-Webster Dictionary Online, Supervision, http://www.merriam-webster.com/dictionary/super vision (last visited Dec. 15, 2015)).  As stated previously, the plaintiffs are requesting the District to, in part, provide someone to issue commands at Carina, hold Carina's leash when

30

she accompanies A.R., and use Carina in accordance with A.R.'s seizure protocol.  With this contrasting view, a court would likely find that the plaintiffs' request mandates the District to "supervise" Carina during the school day, in violation of § 35.136(e).

      (c)  <u>§ 35.136(h) – Surcharges</u>

Citing this subsection, the plaintiffs argue that requiring them to pay for Carina's handler "is an illegal surcharge and therefore, in itself, a discriminatory practice akin to forcing them to pay for additional liability insurance or shots for the animal."  Pls.' Prop. Find. of Fact and Concl. of Law 10, Doc. No. 22.

Generally, public entities are prohibited from placing a surcharge on a disabled individual "to cover the costs of measures, such as the provision of auxiliary aids or program accessibility, that are required to provide that individual or group with the nondiscriminatory treatment required by the [ADA]."  28 C.F.R. § 35.130(f).  In regard to service animals, § 35.136(h) states, in full:

> A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets. If a public entity normally charges individuals for the damage they

31

> cause, an individual with a disability may be charged
> for damage caused by his or her service animal.

28 C.F.R. § 35.136(h).

Reading § 35.130(f) and § 35.136(h) in combination, the

regulations reasonably conclude that if the defendants were

required to provide a handler for Carina, they could not charge

the plaintiffs for the service.  See § 35.130(f); § 35.136(h).

If the defendants are found to be not responsible for handling

Carina, then it is reasonable that paying for a handler would

not be a surcharge, but instead fall under the subsection's

"fees . . . generally not applicable to people without pets"

provision.  § 35.130(f).  Therefore, this subsection is

inapplicable until final disposition on the merits of the

plaintiffs' preliminary injunction.

### 2.   28 C.F.R. § 35.135 – Personal Services

The defendants also argue that the plaintiffs are

improperly requesting the District to provide "services of a

personal nature" for A.R.  Defs.' Post-Hearing Brief 12, Doc.

No. 35.  Pursuant to § 35.135, public entities are not required

to provide disabled individuals with "personal devices, such as

wheelchairs; individually prescribed devices, such as

prescription eyeglasses or hearing aids; readers for personal

use or study; or services of a personal nature including

<u>assistance in eating, toileting, or dressing</u>."  28 C.F.R. §
35.135 (emphasis added).

Like in <u>AP ex rel. Peterson</u>, this court "has difficulty
understanding the purpose and reach of § 35.135, as many
otherwise reasonable accommodations requested by disabled
persons—and routinely provided by school districts and other
public entities—could be considered 'services of a personal
nature.'"  538 F. Supp. 2d at 1152.  Arguably, the District
currently performs multiple "services of a personal nature" for
A.R. including feeding A.R. through a tube during lunch,
assisting A.R. with walking from place to place, and wiping
A.R.'s mouth to prevent skin irritation.  Hr'g Tr. Excerpt 11:3-
14:10, 18:3-15, 19:3-16, Doc. No. 38.  The defendants do not
contend that these services are unreasonable accommodations or
prohibited by § 35.135.  Yet, according to the defendants, "dog
handling responsibilities, namely the training of and assignment
of individuals to issue commands, control the dog and provide it
with reinforcements" is simply a bridge too far.  Defs.' Post-
Hearing Brief. 12, Doc. No. 35.

As a service animal, Carina is trained to detect and alert
for seizures.  Agreed Facts ¶ 15, Doc. No. 18.  Like a
wheelchair, prescription eyeglasses, or hearing aids, Carina's
purpose is medically based.  Pursuant to § 35.135, a school

33

district is not required to provide a wheelchair, but it is
common sense that a school district must assist in pushing the
wheelchair.  In addition, authority supports that a school
district must provide a reasonable accommodation in medical
services, even if it may be considered "personal services."  See
AP ex rel, 538 F. Supp. 2d at 1152 ("In the absence of any
authority requiring § 35.135 to be construed broadly, the Court
will not construe it to cover [plaintiff's] request that
[defendant's] be trained and authorized to provide a glucagon
injection in the event of an emergency.).  Thus, it is unlikely
that the plaintiffs' request will be rejected as a "personal
service" under § 35.135.

    C.   Summary

    At the preliminary injunction stage, the "court is required
only to make an estimation of likelihood of success and 'need
not predict the eventual outcome on the merits with absolute
assurance.'"  Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 10 (1st
Cir. 2013) (quoting Ross-Simons of Warwick, Inc. v. Baccarat,
Inc., 102 F.3d 12, 16 (1st Cir. 1996)).  As detailed above, the
plaintiffs are requesting that the District: (1) during the
school day, pay for a District employee to issue verbal commands
at Carina, hold Carina's leash when it accompanies A.R., and use
Carina in accordance with A.R.'s seizure protocol, and (2) pay

for a 4 Paws trainer to travel to New Hampshire and conduct five
days of training with Carina and District personnel.   The
plaintiffs contend that these requests are reasonable and the
District's refusal to implement the plaintiffs' requests
violates Title II and Section 504.   However, in reviewing the
applicable law and regulations, although the plaintiffs were not
required to exhaust their claims under IDEA, the court believes
that the plaintiffs are unlikely to succeed on the merits of
their claim.

      The plaintiffs cite Alboniga and C.C. to argue that their
requests are reasonable under the ADA.   See Alboniga, 87 F.
Supp. 3d at 1344 (finding that the student's requests to be
tethered to the service dog, "thereby acting as [the service
dog's] handler" and the school "(through its staff) assist[] him
and accompany [the service dog] outside of the school premises
to urinate at the infrequent occasions when it is necessary to
do so during the school day" was reasonable "within the meaning
of the regulations implementing the ADA"); C.C., 2011 U.S. LEXIS
88287, at *11–12 (granting preliminary injunction based on
finding that requiring the school to provide an aide "to hold
the dog's leash when navigating campus, provide the dog with
water, and tether and untether [the dog] to plaintiff
occasionally throughout the day" would neither fundamentally

alter the school's educational program nor necessarily pose an unreasonable accommodation).

The plaintiffs' modification requests, however, go beyond the assistance sought in <u>Alboniga</u> and <u>C.C.</u>  In both cases, the students were able to be tethered to the service dog, thus acting as the service dog's "handler" during the school day <u>Alboniga</u>, 87 F. Supp. 3d at 1344; <u>C.C.</u>, 2011 U.S. LEXIS 88287, at *11–12.  Additionally, in both cases, the students' accommodation requests required district personnel to only <u>occasionally</u> assist the students and their service dogs during the school day.  See <u>Alboniga</u>, 87 F. Supp. 3d at 1344 (requesting the school district to assist the student and "accompany [the service dog] outside of the school premises to urinate at the infrequent occasions when it is necessary to do so during the school day."); <u>C.C.</u>, 2011 U.S. LEXIS 88287, at *11–12 (requesting the school district to tether and untether the service dog to the student occasionally throughout the day).

Here, A.R. cannot be tethered to Carina, use voice commands, or hold Carina's leash at any time throughout the day. Thus, A.R. is unable to "control" or "handle" Carina, as required by regulation.  See 28 C.F.R. § 35.136(d).  As such, distinguishable from both <u>Alboniga</u> and <u>C.C</u>, Carina needs a dedicated handler during the <u>entire</u> school day.  Further, in

addition to needing a dedicated handler, a future court could reasonably find that the plaintiffs are requesting District personnel to continuously "supervise" Carina during the school day, in violation of ADA regulations.  See 28 C.F.R. § 35.136(e).

Moreover, the District's current service animal policy would satisfy the limited requests made in Alboniga and C.C. The District's policy provides "support to a student using a service animal" but only in "particular instance[s]."  Defs.' Ex. 10.  The "particular instance" provision supports District personnel infrequently taking a service animal outside to relieve itself (Alboniga) or occasionally tethering or untethering a service animal during the day (C.C.).

Therefore, in comparing the plaintiffs' modification requests to the cases cited by the plaintiffs and analyzing the applicable regulations, the plaintiffs have not met their burden at the preliminary injunction stage to establish a strong likelihood that they will ultimately prevail in this case.

## II.  **Irreparable Harm**

Under this factor, the plaintiffs argue that "A.R. is likely to suffer irreparable harm as the result of the District's refusal to accommodate A.R.'s . . . service dog while at school."  Pls.' Mot. for Prelim. Inj. 9, Doc. No. 2.

Specifically, the plaintiffs state that they can no longer afford to pay for a handler for Carina during the school day. Therefore, the plaintiffs argue, they will be forced to keep Carina at home, damaging the bond between A.R. and Carina, or, as Mrs. Riley stated during the hearing, pull A.R. from school and risk truancy.

"In the classic meaning of the term, an injury is irreparable if it 'cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy.'"  Nw. Bypass Grp. v. U.S. Army Corps of Engineers, 470 F. Supp. 2d 30, 64 (D.N.H. 2007) (quoting Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005)). In addition, [a] finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162 (1st Cir. 2004).  Lastly, the irreparable harm must "flow from the denial of an injunction."  Pauls v. Sec'y of Air Force, 457 F.2d 294, 298 (1st Cir. 1972).

Here, the hearing testimony and case record are insufficient to carry the plaintiffs' substantial burden. First, the plaintiffs' fears of truancy remain speculative.

Second, any other injury could be addressed by a later-issued damages remedy.  If the plaintiffs keep A.R. in school, but remove Carina due to financial hardship, future damages could support additional training to reestablish the "bond" lost between A.R. and Carina.  On the other hand, if the plaintiffs decide to remove A.R. from school, the plaintiffs' decision would not "flow from the denial of [the] injunction[,]" as the District's policy currently permits Carina to be at school with A.R.  Pauls, 457 F.2d at 298.

Nevertheless, irreparable harm is examined on "a sliding scale, working in conjunction with a moving party's likelihood of success on the merits, such that the strength of the showing necessary on irreparable harm depends in part on the degree of likelihood of success shown." Braintree Labs., Inc., 622 F.3d at 42-43 (internal quotation marks and citations omitted).  In light of the fact that the plaintiffs are unlikely to succeed on the merits of their claim, they have not demonstrated immediate and irreparable harm.

### III. Balancing of Equities and the Public Interest

The remaining elements required for preliminary injunctive relief call upon the court to assess the balance of the equities among the parties, and the public interest (if any) in the issuance of an injunction.

The balancing of the equities inquiry requires the court to weigh "the hardship that will befall the nonmovant if the injunction issues contrasted with the hardship that will befall the movant if the injunction does not issue." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d 112, 115 (1st Cir. 2006). In conjunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Winter, 555 U.S. at 24 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

The plaintiffs argue that denying their "preliminary injunction puts A.R.'s health at risk, as he could be harmed seriously in a seizure without a pre-alert, as well as the bond between A.R. and Carina." Pls.' Prop. Find. of Fact and Concl. of Law 16, Doc. No. 22. In addition, the plaintiffs note that "[p]rotecting the rights of individuals with disabilities is clearly in the public's interest." Id. at 17. The defendants do not discuss these factors in their briefs.

The court acknowledges the Rileys' sincere and dedicated efforts to support A.R., and the undisputed financial burden they carry related to paying for Carina's handler. The court also recognizes that "the public interest is supported by enforcing the [ADA]." Axelrod v. Phillips Acad., Andover, 36 F. Supp. 2d 46, 50 (D. Mass. 1999). The court agrees with the

plaintiffs that "[t]he cost of training a 1:1 aid to assist A.R. with Carina . . . [and] the cost for a week's training by 4 Paws at the school" are "measurable and compensable."  Pls.' Prop. Find. of Fact and Concl. of Law 16, Doc. No. 22.  However, precisely because these costs are "measurable and compensable," they may be addressed by a later-issued damages remedy.

As to the plaintiffs' contention that A.R. "could be harmed seriously in a seizure without a pre-alert" by Carina, testimony reveals that school officials, throughout the school day, "are always on alert for a seizure" and "always within an arm's reach of [A.R.]."  Hr'g Tr. Excerpt 13:16-23, Doc. No. 38.

Therefore, based on the parties' contentions and facts of this case, the court concludes that these final two factors do not clearly weigh for or against the plaintiffs.[8]

## Conclusion

The ADA requires the District to make reasonable accommodations to ensure that A.R. has meaningful access to educational benefits.  The plaintiffs' current accommodation requests, however, do not satisfy the limitations set by the

---

[8] Because the court does not recommend an injunction, the discussion of bond subsequent to a successful preliminary injunction is irrelevant.

regulations and applicable law.  Therefore, the court concludes
that the plaintiffs have not established their right to a
preliminary injunction, relief which the Supreme Court has
characterized as "extraordinary and drastic."  <u>Munaf</u>, 553 U.S.
at 689.  Accordingly, the plaintiff's motion for a preliminary
injunction, Doc. No. 2, should be denied.

The court grants the parties' agreed upon facts (Doc. No.
18).  The court also grants in part and denies in part any
disputed findings of fact and conclusions of law as incorporated
in this Report and Recommendation.

Any objections to this Report and Recommendation must be
filed within fourteen days of receipt of this notice.  <u>See</u> Fed.
R. Civ. P. 72(b)(2).  Failure to file objections within the
specified time waives the right to appeal the district court's
order. <u>See</u> <u>United States v. De Jesús-Viera</u>, 655 F.3d 52, 57 (1st
Cir. 2011); <u>Sch. Union No. 37 v. United Nat'l Ins. Co.</u>, 617 F.3d
554, 564 (1st Cir. 2010).

_Andrea K. Johnstone_
Andrea K. Johnstone
United States Magistrate Judge

December 21, 2015

cc:   Kirk C. Simoneau, Esq.
      Melissa A. Hewey, Esq.
      Dona Feeney, Esq.
      Jeanne M. Kincaid, Esq.